| | |
|---|---|
| **RICKY HAGANS,** | |
| *Plaintiff,* | **CIVIL ACTION NO.** |
| **v.** | **5:17-cv-00379-TES** |
| **JOHN B. KENNEDY, MEGAN WRIGHT, and KAREN WRIGHT,** | |
| *Defendants.* | |

## ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Plaintiff alleges that Defendants John B. Kennedy, Megan Wright, and Karen Wright conspired to falsely arrest and maliciously prosecute him in violation of his Fourth Amendment rights and that they maliciously arrested and prosecuted him in violation of Georgia law. Defendants move for summary judgment on the claims against them, and for the following reasons, Defendants Megan Wright and Karen Wright's Motion for Summary Judgment [Doc. 24] and Defendant Kennedy's Motion for Summary Judgment [Doc. 27] are **GRANTED**.

## FACTUAL BACKGROUND

This action arises from Plaintiff's arrest for stalking and the subsequent nolle prosequi of the charges against him. At the time of the relevant events, Plaintiff, then 47 years old, worked with Defendant Megan Wright ("Megan"), then 17 years old, at

Howard Sheppard, Inc., a trucking company in Sandersville, Georgia. [Doc. 24-1, ¶¶ 1–3; Doc. 27-1, ¶¶ 1, 4]. On February 24, 2014, Megan and her mother, Defendant Karen Wright ("Karen"), sat down with Defendant John B. Kennedy ("Officer Kennedy"), who was a police officer with the City of Sandersville Police Department at the time, to discuss two encounters Megan claims she had with Plaintiff on February 18 and 21. [Doc. 27-1, ¶¶ 9, 39]. Megan gave Officer Kennedy a statement, in which she wrote:

> Tuesday, February 18, 2014 about 5:45pm I was walking into Walmart while talking on the phone with my mom . . . . Walking to the cards I passed [Plaintiff] Ricky Hagans, I recognized him from work (Howard Sheppard). He smiled and said hey so I said hey, like any time at work. Then I saw a friend of my parents, Voyen Souter. I stopped to speak to him at the corner of the cards aisle beside the womens clothing[,] still on the phone with my mom. Mr. Voyen and I talked for a few minutes. During this time, [Plaintiff] comes up behind Mr. Voyen and mouthed to me to call him. I looked back at Mr. Voyen and ignored [Plaintiff]. Then he moved even closer[,] looked me up and down and mouthed[,] "You really need to call me." That time I just looked at him like he was stupid. Mr. Voyen walked away and I went to the card aisle to find a card (still on the phone with mama). [Plaintiff] walks with his buggy behind the aisle I was on, across the outside aisle and backed [himself] and buggy into the aisle across from me and just watched me. At this point I had enough so I left.

> Friday, February 21, 2014 about 5:20 or 5:30 pm I went to Walmart to get pants. Again I walked in the pharmacy side and as soon as I went to turn by the cash registers I saw [Plaintiff]. Immediately I put my head down and quickly turned and kept walking. Then I heard "Hey Megan!" I looked back and there was [Plaintiff] saying hey. I replied hey and kept walking. I replied hey hoping that he would leave me alone.

[Doc. 1-1]. Megan testified that the first encounter made her "very uncomfortable." [Doc. 42, pp. 18:21—19:1].

Plaintiff, on the other hand, testified that he saw Megan in Walmart on February 11—not February 18—but did not know who she was. [Doc. 25, pp. 70:1—72:1]. According to Plaintiff, Megan waved at him, but because he did not recognize her, he "went about [his] business" and entered the checkout line. [*Id.*]. While he was in line, his wife called and asked him to look at the prices for microwaves because theirs had stopped working. [*Id.*]. Plaintiff exited the checkout line, started walking toward the microwaves, and saw Megan again. [*Id.*]. She was "constantly waving" at him but stopped to speak with a man before she could reach Plaintiff. [*Id.*]. Rather than stopping to mouth words to Megan as she claims, Plaintiff testified that he kept walking past her and the man to whom she was speaking. [*Id.*]. When he got to the microwave aisle, he saw Megan across from him in the card aisle and called his wife to tell her that Megan was looking at him like she wanted to say something. [*Id.*]. His wife told him to leave, so he re-entered the checkout line and saw Megan leave the store. [*Id.*]. He testified that after February 11, he never saw Megan again, even though he admits that he may have been in the same Walmart on February 21 when Megan claims he spoke to her. [*Id.* at pp. 71:25—72:1, 76:25—77:1, 78:5—13].

Prior to meeting with Megan and Karen on February 24, Officer Kennedy went to the Walmart to review surveillance footage based on limited information he had received

from Megan and Karen before the meeting. [Doc. 40, pp. 21:21—22:8].[1] In three black-and-white still photos from the February 18 surveillance footage, a person—whose features are unascertainable—is circled with black marker. [Doc. 40, pp. 91–93]. In one of these photos, the circled person has a shopping cart and is labeled "backing buggy into aisle." [*Id.* at p. 93].[2] None of the still photos in the record are date-stamped February 21. [*Id.* at pp. 91–95]. Because the surveillance video contained no audio, Officer Kennedy could not tell whether the person in the video spoke to Megan. [Doc. 40, p. 34:3–6]. Karen testified that after Officer Kennedy viewed the surveillance footage, he contacted her and told her that the video clearly depicted the events that Megan claimed had occurred. [Doc. 43, pp. 16:23—17:4].

Megan and Karen testified that Officer Kennedy made reference to other incidents involving Plaintiff that he knew of, and they believed they were a small part of a bigger criminal investigation of Plaintiff. [Doc. 42, pp. 40:11—41:3, 57:18–25, 59:9–15; Doc. 43, pp. 21:5—22:4]. Kennedy disputes telling Megan and Karen that he had evidence of other incidents involving Plaintiff, [Doc. 40, p. 30:15–19], and he testified that he gave them two

---

[1] The timeline of events is unclear in this regard. It seems that after Megan's first encounter, Karen called Officer Kennedy on February 19 or 20 to see if he could help identify the man with whom Megan claimed to have interacted. [Doc. 40, pp. 17:4–9, 18:9–16; Doc. 43, pp. 13:23—14:3, 14:14–17]. At some point in the next couple of days, Megan and Karen met with Officer Kennedy in person, and Megan explained what occurred during both of her encounters with Plaintiff. [Doc. 40, pp. 20:12–23]. Around this same time, Megan met with Howard Sheppard executives and identified Plaintiff based on photos presented to her on Howard Sheppard President Cliff Sheppard's iPad. [Doc. 42, pp. 49:10—50:12].

[2] The parties did not tender a copy of the surveillance video into evidence.

options: he could personally ask Plaintiff to leave Megan alone or they could proceed with criminal action. [*Id.* at pp. 29:18—30:2]. He further testified that they chose the second option. [*Id.* at p. 30:3–5]. However, Megan testified that they never told Officer Kennedy that they wanted to press charges against Plaintiff; they simply wanted law enforcement to be aware of these events in case they developed further. [Doc. 42, pp. 47:16—48:4, 54:2–5]. Karen, on the other hand, testified that it was her decision to press charges against Plaintiff and supported Officer Kennedy's decision to arrest Plaintiff as long as he had enough evidence to do so. [Doc. 43, pp. 23:18—24:2, 24:1–23].

Armed with Megan's statement, a copy of the surveillance video, copies of the still photos from the video, and his belief that he had probable cause to arrest Plaintiff, Officer Kennedy applied for an arrest warrant from the Washington County Magistrate Judge. [Doc. 40, pp. 38:15—39:4, 67:19–25]. Officer Kennedy's affidavit in support of his warrant application merely states, "Subject is following and harassing [Megan] to go out with him." [*Id.* at p. 87]. When asked what evidence he based this statement on, Officer Kennedy testified that he made the assumption that Plaintiff was attempting to get Megan to date him based on Megan's statement that Plaintiff told her to call him. [*Id.* at pp. 35:25—36:15].[3] Officer Kennedy also testified that the Walmart surveillance video showed Plaintiff following Megan through the store. [*Id.* at p. 35:4–7].

---

[3] Q: And why did you make that assumption? A: Usually that's why men want women to call them. [Doc. 40, p. 36:14–15].

On February 26, 2014, after reviewing Officer Kennedy's affidavit and Megan's statement—but not the surveillance footage or still photos—the Washington County Magistrate Judge issued a warrant for Plaintiff's arrest. [*Id.* at p. 39:1–10, p. 87]. Plaintiff was arrested at work the next day and subsequently charged via accusation with stalking Megan in violation of Ga. Code Ann. § 16-5-90. [*Id.* at p. 97; Doc. 25, p. 26:6–9]. In Georgia, stalking is defined as following, placing under surveillance, or contacting another person at a certain place without that person's consent for the purpose of harassing and intimidating him or her. Ga Code Ann. § 16-5-90(a)(1).

> [T]he term 'harassing and intimidating' means a knowing and willful course of conduct directed at a specific person which causes emotional distress by placing such person in reasonable fear for such person's safety or the safety of a member of his or her immediate family, by establishing a pattern of harassing and intimidating behavior, and which serves no legitimate purpose.

*Id.* A person who commits this offense and has no previous conviction for this offense is guilty of a misdemeanor. *Id.* at (b).

Several months after Plaintiff was charged, Kerri Sheram, a woman who worked at Howard Sheppard with Megan and who was, coincidentally, Officer Kennedy's former stepdaughter, gave Officer Kennedy a written statement in which she claimed that Plaintiff followed her around town, loitered around her workplace, and sent her letters in 1992 when she was 16 years old. [Doc. 25-1; Doc. 39, pp. 7:17–19, 10:2–5]. Tamiko Watts also wrote a statement regarding Plaintiff after seeing an article in the Sandersville newspaper about his arrest. [Doc. 41, pp. 5:18—6:25]. In her statement, Ms. Watts wrote

that she "experienced harassing phone calls, being followed, and inappropriate comments" from Plaintiff at an unspecified time, which made her "feel like [she] was being stalked." [Doc. 25-2]. She gave her statement to Karen, who she worked with, and Karen forwarded it to Officer Kennedy. [Doc. 41, p. 6:21–25; Doc. 43, p. 31:12–19]. Officer Kennedy put the statements in his investigative file and informed the solicitor that he had them in case they were needed during Plaintiff's prosecution. [Doc. 40, pp. 75:22—76:4]. On January 11, 2016, after repeated continuances, a Washington County State Court judge dismissed Plaintiff's criminal action via nolle prosequi. [Doc. 1-3, p. 1].

Plaintiff filed this action on October 6, 2017, alleging that Defendants falsely claimed that Plaintiff followed Megan and asked her to go out with him. *See generally* [Doc. 1]. He further alleges that Defendants conspired to secure his arrest and prosecution despite knowing that Megan's statement and Officer Kennedy's affidavit were false. According to Plaintiff, Officer Kennedy also knew that he did not have probable cause to arrest Plaintiff but sought and obtained a warrant anyway. Based on these contentions, Plaintiff seeks to hold Defendants liable under 42 U.S.C. § 1983 for civil conspiracy to falsely arrest and maliciously prosecute him; under Ga. Code Ann. § 51-7-1 for maliciously arresting him; and under Ga. Code Ann. § 51-7-40 for maliciously prosecuting him. Defendants now move for summary judgment on the claims against them, and the Court finds as follows.

## DISCUSSION

### A.    Standard of Review

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). As to issues for which the movant would bear the burden of proof at trial, the "movant must affirmatively show the absence of a genuine issue of material fact and support its motion with credible evidence demonstrating that no reasonable jury could find for the non-moving party on all of the essential elements of its case." *Landolfi v. City of Melbourne*, 515 F. App'x 832, 834 (11th Cir. 2013) (citing *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993)). As to issues for which the non-movant would bear the burden of proof at trial, the movant may (1) simply point out an absence of evidence to support the non-moving party's case or (2) provide "affirmative evidence demonstrating that the [non-movant] will be unable to prove its case at trial." *United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Ctys.*, 941 F.2d 1428, 1438 (11th Cir. 1991) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the movant satisfies its burden, the burden shifts to the non-movant, who must "go beyond the pleadings and present *affirmative evidence* to show that a genuine issue of material fact exists." *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006) (citing

*Fitzpatrick*, 2 F.3d at 1115–17) (emphasis added). "A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Four Parcels*, 941 F.2d at 1437 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, (1986)).

### B.    Count Five: Section 1983 Civil Conspiracy and False Arrest

In Count Five of his complaint, Plaintiff alleges that he was falsely arrested as a result of Defendants' actions. In moving for summary judgment, Officer Kennedy points out that federal false arrest claims require proof that the plaintiff was arrested without a warrant. *See Jones v. Brown*, 649 F. App'x 889, 890 (11th Cir. 2016) (citing *Brown v. City of Huntsville*, 608 F.3d 724, 734 (11th Cir. 2010)). Plaintiff does not dispute that his claims arise from an arrest pursuant to a warrant and concedes that his false arrest claim is improper. Therefore, the Court **GRANTS** summary judgment to Defendants on Count Five.[4]

### C.    Count Six: Section 1983 Civil Conspiracy and Malicious Prosecution

Plaintiff argues that Defendants conspired to maliciously prosecute him in violation of the Fourth Amendment because (1) the victim statement upon which Officer

---

[4] Similarly, Plaintiff concedes that his state-law malicious arrest claim is properly brought as a state-law malicious prosecution claim because he was arrested with judicial process (i.e., pursuant to a warrant) and then prosecuted (as opposed to the warrant being dismissed or not followed by prosecution). *See Stephens v. Zimmerman*, 774 S.E.2d 811, 815 (Ga. Ct. App. 2015) (quoting *Garner v. Heilig-Meyers Furniture Co.*, 525 S.E.2d 145, 146–47 (Ga. Ct. App. 1999)). Thus, Defendants' Motions for Summary Judgment are also **GRANTED** on Count One.

Kennedy relied to obtain an arrest warrant was false; (2) Officer Kennedy falsely stated in his affidavit that Plaintiff was harassing Megan to go out with him; (3) Officer Kennedy omitted material facts from his affidavit that would have prevented a finding of probable cause; and (4) Officer Kennedy's affidavit in support of his warrant application was so lacking that any reasonable officer would have known that he did not have probable cause to arrest. The Court disagrees with each of these arguments.

A viable civil conspiracy claim under Section 1983 requires proof that "(1) the defendants reached an understanding or agreement that they would deny the plaintiff one of his constitutional rights; and (2) the conspiracy resulted in an actual denial of one of his constitutional rights," with such denial having been committed by a person acting under color of state law. *Hendrickson v. Cervone*, 661 F. App'x 961, 968 (11th Cir. 2016) (per curiam) (first quoting *Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1327 (11th Cir. 2015) and then quoting *Patrick v. Floyd Med. Ctr.*, 201 F.3d 1313, 1315 (11th Cir. 2000)). A private person acts under color of state law when she conspires with a state official to deprive another of his federal rights. *Id.* (quoting *Tower v. Glover*, 467 U.S. 914, 920 (1984)); *see also NAACP v. Hunt*, 891 F.2d 1555, 1563 (11th Cir. 1990) ("Private parties who corruptly conspire with state officials to maliciously prosecute an individual . . . act under color of state law and can be sued by that individual under section 1983.").

1.     <u>Understanding or Agreement</u>

Plaintiff argues cursorily that "[t]he web of contradictions between the testimony of the Wright Defendants and Defendant Kennedy reveal an effort to arrest [Plaintiff for] stalking, when there were not sufficient facts to even create arguable probable cause" and that Megan and Karen "set about to 'create' facts that would support the prosecution of [Plaintiff]" when they "first approached Defendant Kennedy with a case that clearly did not constitute probable cause to believe stalking had occurred." [Doc. 34, pp. 19–20]. "While a plaintiff need not come forward with a 'smoking gun' to show an understanding, he must 'show some evidence of agreement between the defendants' and willful participation." *Pittman v. State Farm Fire & Cas. Co.*, 662 F. App'x 873, 880 (11th Cir. 2016) (quoting *Bendiburg v. Dempsey*, 909 F.2d 463, 469 (11th Cir. 1990)). Plaintiff does not elaborate on the "web of contradictions" he believes points to evidence of an agreement, and the Court can only deduce that he means the disparity in the dates Defendants claim they met and the dispute as to who decided to press charges against Plaintiff.

But these facts are insufficient to support the inference of conspiratorial agreement, especially because each of the Defendants testified that their recall was affected by the four-year period between the date of the events giving rise to Plaintiff's arrest and the date of their depositions. Moreover, Plaintiff points to no specific evidence that Defendants reached any agreement to prosecute him without probable cause. This failure to present evidence of any agreement suffices to dismiss Plaintiff's claim.

Even if Plaintiff had presented evidence of an agreement, the Court finds below that the second requirement of the civil conspiracy analysis—that the civil conspiracy result in an actual denial of Plaintiff's civil rights—is not met.

2. Actual Denial of Plaintiff's Civil Rights

Plaintiff claims that Defendants succeeded in their conspiracy to maliciously prosecute him when Officer Kennedy applied for and received a warrant with a false and insufficient affidavit. To succeed on a malicious prosecution claim, a plaintiff must prove "(1) the elements of the common-law tort of malicious prosecution and (2) a violation of [Plaintiff's] right to be free from unreasonable seizures." *Blue v. Lopez*, 901 F.3d 1352, 1357 (11th Cir. 2018) (quoting *Wood v. Kesler*, 323 F.3d 872, 881 (11th Cir. 2003)). The common-law elements of a malicious prosecution claim are: "(1) a criminal prosecution instituted or continued by the present defendant; (2) with malice and without probable cause; (3) that terminated in the plaintiff accused's favor; and (4) caused damage to the plaintiff accused." *Id.* (quoting *Kjellsen v. Mills*, 517 F.3d 1232, 1237 (11th Cir. 2008)).

Officer Kennedy argues that he is entitled to qualified immunity on this claim. Qualified immunity protects public officers acting within the scope of their discretionary authority as long as they do not violate clearly established law. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). The burden of proof for a qualified immunity defense initially rests with the officer, who must show that he was "acting within the scope of his discretionary authority when the alleged wrongful acts occurred." *Lee v. Ferraro*, 284 F.3d 1188, 1194

(11th Cir. 2002). In this case, neither party disputes that Officer Kennedy acted within his discretionary authority during his investigation of Megan's claims, Plaintiff's arrest, and the subsequent prosecution of Plaintiff's criminal case. Therefore, the burden shifts to Plaintiff to show that immunity does not apply. *Id.* Plaintiff satisfies this burden if the facts, taken in the light most favorable to him, show that Officer Kennedy's conduct violated a clearly established constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). A plaintiff can point to a clearly established constitutional right in one of three ways: (1) by pointing to a materially similar case decided by the Supreme Court, the Eleventh Circuit Court of Appeals, or the Georgia Supreme Court; (2) by showing that a "broader, clearly established principle" that is "established with obvious clarity" and that controls the "novel facts of the situation"; or (3) by showing that the officers' conduct in this case "so obviously violated the constitution that prior case law is unnecessary." *Terrell v. Smith*, 668 F.3d 1244, 1255–56 (11th Cir. 2012) (internal citations omitted).

In this case, Plaintiff argues that Defendants maliciously prosecuted him by procuring a warrant based on falsified evidence, misstatements, and omissions and by presenting a warrant affidavit that was so deficient that it could not possibly establish probable cause to arrest Plaintiff. It was clearly established at the time of the events giving rise to this action that an officer commits a Fourth Amendment violation when he makes perjurious or recklessly false statements or omissions in support of a warrant. *Kelly v. Curtis*, 21 F.3d 1544, 1554 (11th Cir. 1994). The officer commits no violation, however, if

the statements or omissions are merely negligent as opposed to reckless or intentional. *Id.*; *see also Madiwale v. Savaiko*, 117 F.3d 1321, 1327 (11th Cir. 1997). It was also clearly established that an officer violates the Fourth Amendment when he submits a warrant application that "does not 'provide the magistrate judge with a substantial basis for determining the existence of probable cause.'" *United States v. Leon*, 468 U.S. 897, 915 (1984) (quoting *Illinois v. Gates*, 462 U.S. 213, 239 (1983)). Nevertheless, an officer who submits a deficient warrant only loses qualified immunity if "a reasonably well-trained officer in [the defendant's] position would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant." *Garmon v. Lumpkin Cty.*, 878 F.2d 1406, 1409–10 (11th Cir. 1989) (quoting *Malley v. Briggs*, 475 U.S. 335, 345 (1986)).

The Court considers in turn whether Megan's allegedly false statement, Officer Kennedy's alleged misstatements in his warrant application, Officer Kennedy's omissions from his warrant application, and Officer Kennedy's allegedly deficient warrant affidavit rise to the level of Fourth Amendment violations.

### a.    *Megan's Falsified Statement*

Plaintiff is correct that the Court must view facts in the light most favorable to him and accept his version of the facts when they are in dispute. *Scott v. Harris*, 550 U.S. 372, 379 (2007) (citing Fed. R. Civ. P. 56(c)). Under Plaintiff's version of the facts, he did not initiate contact with Megan during their first Walmart encounter, he did not follow her

in the store, and he did not see or speak to her during the second alleged Walmart encounter. He therefore argues that there is a question of fact as to whether Megan lied in the statement she gave to Officer Kennedy. However, when assessing qualified immunity on a malicious prosecution claim based on false statements made in support of a warrant application, the Court concerns itself only with the information that was within the officer's knowledge at the time he instituted or continued the prosecution against the accused. *See Grider v. City of Auburn*, 618 F.3d 1240, 1257 (11th Cir. 2010) (Arguable probable cause exists in the context of an arrest when "reasonable officers in the same circumstances and *possessing the same knowledge as the Defendant[]* could have believed that probable cause existed to arrest Plaintiff." (emphasis added)). Furthermore, Supreme Court precedent mandates that officers only make a "truthful showing" of probable cause in support of a warrant application. *Franks v. Delaware*, 438 U.S. 154, 164–65 (1978).

> This does not mean "truthful" in the sense that every fact recited in [support of the warrant application] is necessarily correct, for probable cause may be founded upon hearsay and information from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily. But surely it is to be "truthful" in the sense that the information put forth is believed or appropriately accepted by the affiant as true.

*Id.* at 165.

Plaintiff does not sufficiently argue that Officer Kennedy knew or had reason to know that Megan's statement was false when he gave it to the magistrate judge, and there

is no evidence in the record to support such an argument. Indeed, the record evidence establishes that Officer Kennedy watched surveillance footage that corroborated Megan's statement, and Plaintiff does not dispute Officer Kennedy's interpretation of the video (except to point out that the video lacks audio and cannot corroborate Megan's statement that Plaintiff spoke to her). It can therefore be presumed that Officer Kennedy believed and appropriately accepted Megan's statement to be true when he presented it to the magistrate judge. Accordingly, Officer Kennedy is entitled to qualified immunity on Plaintiff's claim that he relied on falsified evidence to obtain a warrant.

b.    *Misrepresentations in Officer Kennedy's Warrant Affidavit*

Plaintiff also claims that Officer Kennedy violated his Fourth Amendment rights by falsely stating in his warrant application that Plaintiff was "harassing [Megan] to go out with him." [Doc. 1-2, p. 2]. As previously stated, an officer commits a Fourth Amendment violation when he makes perjurious or recklessly false statements or omissions in support of a warrant. *Kelly*, 21 F.3d at 1554. The officer commits no violation, however, if the statements or omissions are merely negligent as opposed to reckless or intentional. *Id.*; *see also Madiwale*, 117 F.3d at 1327.

The Eleventh Circuit noted in 1994 that the line between what constitutes a reckless misstatement as opposed to a negligent misstatement in a warrant affidavit was not clearly established. *Kelly*, 21 F.3d at 1554. Plaintiff cites no precedential case, and the Court can find none, that has elaborated on the difference in the meantime, and where

"case law, in factual terms, has not staked out a bright line," qualified immunity usually protects the defendant. *Id.* Even so, the Court finds that Officer Kennedy's alleged misstatement was, at most, negligent. Plaintiff argues that Officer Kennedy had no factual basis for stating that Plaintiff was asking Megan to go out with him, and in his deposition Officer Kennedy admits that Megan did not write that Plaintiff wanted her to go out with him in her statement. However, Megan *did* write that Plaintiff looked her up and down and mouthed, "You really need to call me." [Doc. 1-1]. Officer Kennedy testified that he made the assumption that Plaintiff wanted Megan to go out with him because "[u]sually that's why men want women to call them." [Doc. 40, p. 36:10–15]. Although this assumption may have been erroneous, it was reasonable under the circumstances, especially given Megan's assertion that Plaintiff looked her up and down before telling her to call him. Plaintiff offers no legal basis to support his reasoning that an officer may not make reasonable assumptions in a warrant application, even if those assumptions could possibly be proven wrong at a later date.

Also, there is no evidence that Officer Kennedy's alleged misstatement was intentional. As previously explained, police officers are required to make a "truthful showing" of probable cause, which means that they believe the information upon which they rely or appropriately accept as true. *Franks*, 438 U.S. 154, 164–65 (1978). Thus, so long as Officer Kennedy believed the facts in his warrant affidavit or appropriately accepted those facts to be true, his affidavit cannot be perjurious in violation of the Fourth

Amendment. *See Kelly*, 21 F.3d at 1555. There is no evidence that Officer Kennedy did not believe that Plaintiff was trying to get Megan to go out with him when he made contact with her. The record reflects that he made the assumption in good faith based on his belief that a man who wants a woman to call him usually wants the woman to go out with him. Accordingly, the Court finds Officer Kennedy's statement that Plaintiff was trying to get Megan to go out with him to be negligent at best and not an appropriate basis upon which to pierce qualified immunity.

        *c.*      *Omissions in Officer Kennedy's Warrant Affidavit*

In addition to the alleged misstatements, Plaintiff argues that Officer Kennedy made material omissions in his affidavit concerning his factual basis for determining that Plaintiff harassed Megan. As with falsehoods, an Officer violates the Fourth Amendment when he recklessly or intentionally omits material facts from his warrant application. *Id.* at 1554. Recklessness may be inferred "when the facts omitted from the affidavit are clearly critical to a finding of probable cause," but even when material facts are omitted recklessly or intentionally, a warrant is only invalidated "if inclusion of the omitted facts would have prevented a finding of probable cause." *Madiwale*, 117 F.3d at 1327 (quoting *United States v. Martin*, 615 F.2d 318, 329 (5th Cir. 1980) and citing *United States v. Jenkins*, 901 F.2d 1075, 1080 (11th Cir. 1990)). An officer loses qualified immunity when "the facts omitted . . . were . . . so clearly material that every reasonable law enforcement officer would have known that their omission would lead to" a violation of federal law. *Id.*

(quoting *Haygood v. Johnson*, 70 F.3d 92, 95 (11th Cir. 1995)). In other words, if an officer's affidavit demonstrates arguable probable cause when the omitted information is included, the officer is entitled to qualified immunity. *Paez v. Mulvey*, 915 F.3d 1276, 1288 (11th Cir. 2019).

Plaintiff does not lay out exactly what facts he believes Officer Kennedy should have included in the warrant affidavit, but even if Officer Kennedy had included all of the facts that were within his knowledge, the magistrate judge would not have been prevented from finding probable cause.

Probable cause depends on the elements of the crime the accused is charged with committing and the operative fact pattern supporting the charge. *Brown*, 608 F.3d at 735. To commit the crime of stalking in Georgia, the accused must (1) commit a knowing and willful pattern of harassing and intimidating behavior that serves no legitimate purpose and that places another person in reasonable fear for their own safety or the safety of a family member by (2) following, placing under surveillance, or communicating with another person, (3) at or about a place that is not the accused's residence, (4) without the other person's consent, (5) for the purpose of harassing or intimidating the other person. Ga. Code Ann. § 16-5-90. Given the nature of the crime, a violation of the stalking statute is inherently fact-specific, and there are no bright-line rules on what constitutes following someone or reasonable fear for one's safety.

Thus, it makes sense that Plaintiff presents only one case that can be construed as even remotely similar to the one at hand. In *Autry v. State*, the state charged the defendant with "follow[ing] [the victim] in her vehicle to a store and watch[ing] her going into and out of said store." 701 S.E.2d 596, 599 (Ga. Ct. App. 2010). The Georgia Court of Appeals reversed the defendant's conviction, finding that one instance of following and watching the victim was not enough to constitute a pattern of harassing and intimidating behavior. *Id.* Plaintiff analogizes *Autry* to this case and argues that his alleged conduct in mouthing words to Megan and then seeing her again later and saying nothing to her does not constitute a pattern.

However, Officer Kennedy wrote in his police report that Megan believed Plaintiff was following her and indicated that the surveillance video shows Plaintiff following Megan in the store. [Doc. 40, p. 90]. The elements of stalking require only that there be a pattern of intimidating and harassing conduct, which can presumably consist of any combination of following, communicating with, and surveilling the victim. The facts within Officer Kennedy's knowledge establish—at a minimum—that Plaintiff communicated with Megan once (i.e., mouthing, "You need to call me."), followed Megan at least once, and watched Megan silently at least once. *Autry*, on the other hand, involves only two out of these three acts, and it is notable that the *Autry* court did not emphasize that its decision was based on the fact that the two acts occurred on the same day. Plaintiff presents no case law establishing that a pattern exists only when the

conduct occurs on different days and in markedly different geographical locations, and it is therefore immaterial that a majority of the facts within Officer Kennedy's knowledge occurred on the same day and inside the confines of a store.

Moreover, although Megan testified that her encounters with Plaintiff made her uncomfortable, no appellate court in Georgia had clarified that a victim's discomfort does not rise to the level of reasonable fear for the victim's safety or that of a member of the victim's immediate family until earlier this year. *See Murphy v. O'Keefe*, 822 S.E.2d 839, 840 (Ga. Ct. App. Jan. 8, 2019). In sum, and given the flexibility of conduct that could have constituted stalking at the time Officer Kennedy sought the arrest warrant, the relevant facts within Officer Kennedy's knowledge at the time he applied for the warrant—that Plaintiff looked Megan up and down and mouthed that she needed to call him, followed Megan in Walmart, stared at her from another aisle, had been positively identified by Megan, and made Megan wary enough to discuss the incidents with law enforcement— would not have *prevented* a magistrate judge from finding probable cause had they been included in the warrant affidavit. *See Madiwale*, 117 F.3d at 1327. At most, these facts would have made the magistrate judge's task a bit harder rather than mandating a denial of the warrant application. Accordingly, the Court finds that Officer Kennedy is also entitled to qualified immunity on Plaintiff's claim that he recklessly or intentionally omitted material facts from the arrest warrant application.

### d. Overall Sufficiency of Officer Kennedy's Warrant Affidavit

Finally, Plaintiff claims that Officer Kennedy's warrant affidavit was so deficient that it could not have established probable cause to arrest Plaintiff. Even where an officer's affidavit does not contain intentional or reckless misstatements or omissions, the officer can violate the Fourth Amendment if he submits a warrant application that "does not 'provide the magistrate judge with a substantial basis for determining the existence of probable cause,'" since magistrate judges are not intended to be mere "rubber stamps" for police officers. *Leon*, 468 U.S. at 915 (first quoting *Gates*, 462 U.S. at 239 and then quoting *Aguilar v. Texas*, 378 U.S. 108, 111 (1964) *abrogated by Gates*, 462 U.S. 213). When an officer in this position asserts qualified immunity, he is not absolved from liability if "a reasonably well-trained officer in [the defendant's] position would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant." *Garmon*, 878 F.2d at 1409–10 (11th Cir. 1989) (quoting *Malley*, 475 U.S. at 345).

With this standard in mind, the Court finds that, although Officer Kennedy's warrant affidavit was possibly insufficient from an objective standpoint, he is nevertheless entitled to qualified immunity because a reasonably well-trained officer in his shoes and with his information would not have known that he should not seek a warrant. The only two factually-similar, precedential cases that were in existence at the time of the events giving rise to this case and that consider this standard concern warrant

applications that contain only a bare allegation that the accused "committed X crime in violation of Y statute." *See Garmon*, 878 F.2d at 1408 (the affiant swore only that "to the best of (his or her) knowledge and belief Teresa Ann Garmon did . . . commit the offense of false report of a crime"); *Kelly*, 21 F.3d at 1548 ("John Kelly, Jr., did commit the offense of Possession of Controlled Substance (Cocaine), in violation of Georgia State Code 16-13-39(b) at 4108 Boyd St., Savannah, Chatham County, GA in said county on or about 15th day of August, 1989."). Officer Kennedy's statement that Plaintiff "is following and harassing subject to go out with him" consists of more than a bare-bones accusation that Plaintiff committed the crime of stalking, albeit not by much. Given the fact-intensive analysis of qualified immunity, the Court cannot say that Officer Kennedy's affidavit completely failed to establish probable cause when compared to clearly established law.

But even if the Court were to find that Officer Kennedy's statement is tantamount to the language in the *Garmon* and *Kelly* affidavits, the second prong of the analysis asks whether a reasonably-trained officer in Officer Kennedy's position would have known that he should not have applied for a warrant because he did not have even arguable probable cause to arrest Plaintiff.[5] The Court has already determined that, given the

---

[5] The plain language of the standard includes two clauses connected by "and." The Court construes this to mean the two prongs are both necessary to establish a constitutional violation, and in both *Garmon* and *Kelly*, the Eleventh Circuit Court of Appeals considered each prong in its analyses. *See also Carter v. Gore*, 557 F. App'x 904, 909 (11th Cir. 2014) (finding that an officer violates the Fourth Amendment "only if her affidavit lacked probable cause *and* she should not have *applied* for the warrant. Inherent in this language is the proposition that qualified immunity is not lost when all the evidence available to the officer establishes at least arguable probable cause, even if this evidence is not listed in an affidavit.") (internal citations omitted) (emphasis in original); *Paez*, 915 F.3d at 1287–88.

flexible landscape of stalking law in Georgia at the time of these events, the information within Officer Kennedy's knowledge could have been enough to warrant a finding of probable cause. And when qualified immunity is implicated in a malicious prosecution claim, an officer need only have arguable probable cause to avoid liability. *Grider*, 618 F.3d at 1257. Arguable probable cause exists in the context of an arrest when "reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed to arrest Plaintiff." *Id.* There is a substantial difference between the level of proof necessary to achieve arguable probable cause and that needed to secure a conviction, particularly because the courts recognize that the information used to secure a warrant "sometimes must be garnered hastily." *Kelly*, 21 F.3d at 1554–55 (11th Cir. 1996) (quoting *Franks*, 438 U.S. at 165–66). Furthermore, officers invoking qualified immunity are not even required to prove every element of the accused's offense, since doing so would obviate the need for probable cause and make prosecutors out of police officers. *Lee*, 284 F.3d at 1995. In this case, reasonable officers in the same circumstances and possessing the same knowledge as Officer Kennedy could have believed that probable cause existed to arrest Plaintiff. Therefore, Officer Kennedy had arguable probable cause to arrest Plaintiff and is entitled to qualified immunity on Plaintiff's malicious prosecution claim.

It stands to reason that if the Court finds that the public officer alleged to be involved in a civil conspiracy is entitled to qualified immunity on the underlying claim

for a denial of a constitutional right, the plaintiff's civil conspiracy claim fails as a matter

of law. *See Signature Pharm., Inc. v. Wright*, 438 F. App'x 741, 746 (11th Cir. 2011) (granting

qualified immunity to officer on Section 1983 civil conspiracy claim by virtue of her

entitlement to qualified immunity on the underlying Fourth Amendment claim); *see also*

*Hendrickson*, 661 F. App'x at 969 (a civil conspiracy requires the involvement of a state

official). As such, Officer Kennedy is entitled to qualified immunity on Plaintiff's civil

conspiracy claim, and the only remaining parties to the claim are Megan and Karen, who

are private citizens incapable of committing a conspiracy under Section 1983.

Accordingly, Plaintiff cannot sustain a civil conspiracy claim, and Defendants are entitled

to summary judgment on Count Six of the complaint.

### D.  **Remaining Claims**

As outlined above, Plaintiff's federal claims fail as a matter of law. Having

disposed of the claims for which it has original jurisdiction, the Court may decline to

exercise supplemental jurisdiction over Plaintiff's remaining state law claims. *See* 28

U.S.C. § 1367(c)(3). The Eleventh Circuit "encourage[s] district courts to dismiss any

remaining state claims when, as here, the federal claims have been dismissed prior to

trial." *Wilson v. Stowe*, 2017 WL 969971, at *6 (M.D. Ga. Mar. 13, 2017) (quoting *Raney v.*

*Allstate Ins. Co.*, 370 F.3d 1086, 1089 (11th Cir. 2004) (per curiam)). The Court sees no

compelling reason to retain supplemental jurisdiction over Plaintiff's state-law malicious prosecution claims and therefore **DISMISSES** them **without prejudice**.[6]

## CONCLUSION

For the reasons stated herein, the Court **GRANTS** the Wrights' Motion for Summary Judgment [Doc. 24] and Officer Kennedy's Motion for Summary Judgment [Doc. 27]. Counts One, Five, and Six are **DISMISSED**, while Counts Two, Three, and Four are **DISMISSED without prejudice**.

**SO ORDERED**, this 21st day of March, 2019.

s/Tilman E. Self, III
**TILMAN E. SELF, III, Judge**
**UNITED STATES DISTRICT COURT**

---

[6] Although the statute of limitations would have otherwise run on these claims, the statute was tolled for the pendency of this action and shall remain tolled for a period of 30 days after the entry of this Order. *See* 28 U.S.C. § 1367(d).